STEPHENSON v. STEPHENSON.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—CONSPIRACY.
No discussion of facts is made on appeal in regard to parcel of property as to which plaintiff does not appear to claim any wrongdoing or conspiracy on her appeal in suit for divorce against her former husband in which she joined his father and husband's paramour on charge of conspiracy to deprive plaintiff of her rights in certain properties.

2. CONSPIRACY—EVIDENCE.
Conspiracy to deprive plaintiff wife in suit for divorce of her interest in property which the parties had occupied for a time as their home *held*, not shown, where evidence shows that defendant father-in-law had paid defendant son's debts and sent the son and plaintiff the balance of the purchase price, that such proceeds were used to pay the son's debts and plaintiff's hospital bills and they signed a quitclaim deed to the father in consideration for his assumption of the obligations of the parties.

3. SAME—EVIDENCE.
Proof of conspiracy to defraud plaintiff of her interest in property which her husband and his brother had inherited upon the death of their mother *held*, lacking, where defendant father-in-law had paid debts for defendant son and then paid him $2,000 for his interest, a very low price, and had occupied the premises for many years before and after obtaining deed signed by plaintiff and her husband.

4. SAME—EVIDENCE.
Evidence that sale of heavily-mortgaged real estate by defendant father-in-law of plaintiff, while he had acted as

REFERENCES FOR POINTS IN HEADNOTES
[2–7] 11 Am Jur, Conspiracy § 51.
[2–7] Civil liability for conspiring to aid debtor to evade payment of his pecuniary obligations. 2 ALR 287.
[8] 17Am Jur, Divorce and Separation § 582.

guardian of her husband had been unnecessary and that such money as had been received went to pay defendant husband's debts and not to support plaintiff wife *held,* insufficient to prove conspiracy to defraud her of property rightfully hers.

5. SAME—EVIDENCE—FIDUCIARY TRANSACTIONS.

Finding of trial judge that plaintiff in suit for divorce had failed to prove her charge of conspiracy between defendant husband and father-in-law to put the son's property beyond her reach and thus prevent her from obtaining a property settlement as well as alimony is not disturbed, where no claimed error was shown and fraud which may have been committed upon the defendant husband by his father, if any, in the latter's handling of fiduciary transactions was too indirect to entitle plaintiff to recover and the husband failed to question any of such transactions.

6. DIVORCE—CONSPIRACY—EVIDENCE—FRAUD—ACCOUNTANT'S RE-PORT AS TO PROBATE COURT FILES.

Exclusion of expert accountant's report as to files of the pro-bate court as evidence of fraud in plaintiff wife's suit for divorce and for conspiracy to place husband's property be-yond her reach for purposes of property settlement and alimony in which her father-in-law had been joined as a defendant was proper, where conspiracy was not proved and probate court had allowed the father-in-law's ac-counts.

7. SAME—CONSPIRACY—INFERENCES.

Inference that plaintiff wife had an interest in property arose from testimony that attorney for defendant father-in-law and corporation which he controlled had unsuccessfully sought to obtain from her a quitclaim deed and an assign-ment of land contract thereon and neither such defendant nor defendant husband in suit for divorce and for con-spiracy to defraud her of her interest in the property pro-duced the land contract by which she and her husband had contracted to purchase the property, notwithstanding claim of a third codefendant, the husband's paramour, of an in-terest in the property.

8. SAME—LIEN FOR COSTS AND ATTORNEY FEE.

A lien upon property of which plaintiff wife is found to have an interest is ordered imposed unless both trial and appel-late costs of suit for divorce and attorney fee, as increased from $150 to $750, are paid within 30 days after entry of

decree in Supreme Court, where defendant husband has at times made it difficult to collect $25 a week awarded for support of the 2 minor children.

9. SAME—ALIMONY—EXCUSE FOR NONPAYMENT—PARAMOUR.
A married man who lives with his paramour and their son is not, by reason of incurring additional expenses for such purpose, excused from paying alimony.

10. SAME—SUPPORT OF CHILDREN.
Award of $25 per week for support of 2 minor children is not increased, even though inadequate, but continued at that amount during minority of younger child, where the older child is married and will be 21 years of age shortly.

11. SAME—ALIMONY.
Alimony in the amount of $50 a month is awarded plaintiff wife in suit for divorce for such period as she remains unmarried, such amount being subject to modification by being increased or decreased as circumstances may develop, where her conduct has been without suspicion of impropriety and she has worked hard to support herself and the 2 minor children of the parties.

12. SAME—COSTS—CONSPIRACY.
Costs of both trial court and Supreme Court are awarded plaintiff wife who appealed from decree granting divorce but denying her property and alimony but no costs are awarded against or in favor of defendant father-in-law and another defendant, paramour of defendant husband, who had been joined in claimed conspiracy to defraud plaintiff by placing husband's property out of reach of plaintiff for purposes of property settlement or alimony.

Appeal from Wayne; Maher (Thomas F.), J. Submitted June 4, 1952. (Docket No. 17, Calendar No. 45,032.) Decided October 6, 1952.

Bill by Virginia Charlotta Stephenson against William Burnette Stephenson for divorce and other relief. Burnette F. Stephenson and Shirley Miles added as parties defendant and charged with the other defendant of a conspiracy to defraud plaintiff. Decree granting divorce entered and dismissing bill

as to Burnette F. Stephenson and Shirley Miles.
Plaintiff appeals.  Modified.

*Davidow & Davidow,* for plaintiff.

*Verne C. Amberson,* for defendants William Burnette Stephenson and Shirley Miles.

*John N. Anhut,* for defendant Burnette F. Stephenson.

BUTZEL, J.  Virginia Charlotta Stephenson, plaintiff herein, on September 20, 1945, filed a bill for divorce against William Burnette Stephenson.  Later she joined as codefendants Burnette F. Stephenson, father of William Burnette Stephenson, and herein referred to as defendant's father, and also Shirley Miles, a woman with whom defendant was living at the time of the hearing, each of whom she alleged had conspired with defendant to deprive plaintiff of her rights in certain properties.  Plaintiff charged defendant with extreme and repeated cruelty, excessive use of intoxicants, indecent language, frequent association with other women and absences from home.  At the hearing in January, 1950, defendant made no effort to deny plaintiff's charges nor did he make any counter charges, or attempt to excuse his conduct.  The judge granted plaintiff a divorce and custody of the minor children of the parties, subject to certain rights of visitation by defendant.  The decree provided for the payment of medical and dental expenses for the children only after approval of expenditures by the court, and also for the payment by defendant of $25 a week for the support of the 2 minor children.  It also provided for payment by defendant of an attorney fee of $150.  Plaintiff was not awarded any alimony.  The judge made no property settlement as he had held that defendant had

no property or rights which plaintiff alleged were being withheld or concealed through a conspiracy. Plaintiff, however, claims on appeal that the conspiracy through which defendant's property rights are being withheld and concealed was proved, that she is entitled to a property settlement, a far larger attorney fee, more ample provision for the support of the minor children and alimony for herself.

Plaintiff and defendant were married on May 14, 1931, when he was 18 and she 17 years of age. They lived together, with the exception of short intervals, until September 15, 1944. They are the parents of 2 children, a daughter now 20 years of age and a son about 16 years of age. Several previous divorce proceedings, begun by plaintiff, had been discontinued following temporary reconciliation. Were it not of importance, considering the charges of conspiracy against the respective codefendants, we would refrain from further discussion of defendant's reprehensible conduct. Besides the other charges against him, his philandering would indicate that he was unmoral in his conduct towards women. Otherwise he can be described by the statement of defendant's father who, when asked about his son's affairs with women, testified that he was too busy writing checks for payment of his son's gambling debts, or things like that and that while plaintiff had consulted him about defendant's gambling and drinking he had no recollection of talking to her, or of her ever complaining about his son's philandering; that when he learned that his son was living with another woman and had a son by her, he was shocked but that he did not reproach him in any way because a suit was pending. Testimony positively proves that defendant was still married to plaintiff while he was living under the same roof with codefendant Shirley Miles and had a son by her. Defendant's father stated that

he met Miss Miles while she was working at a cherry orchard at Lexington, Michigan, owned or controlled by his company, and that "she had driven her husband over to work, I mean William Burnette Stephenson." When his attention was called to the use of the word "husband" he asked to withdraw his answer and correct it. It is seldom that a court is called upon to review such brazen conduct as that of defendant and Miss Miles with whom defendant was living while plaintiff was trying to make a living for herself and children and had to be assisted by the help and charity of others. The intimate association of defendant with Miss Miles enters largely into the discussion of what is heretofore referred to as the Lexington property.

In the charges of conspiracy in the amended bill of complaint, plaintiff claims that defendant's father conspired with defendant to dispose of or to divest plaintiff of title in a piece of property outside of Detroit, Michigan, which we shall refer to as the home in Berkley, Michigan; the Ten Mile road property in Oakland county, Michigan; property at Woodward and Richton avenues (Highland Park, Michigan); and interest in a house on Longfellow avenue in Detroit, Michigan. Plaintiff also charges that defendant conspired with Shirley Miles so as to deprive plaintiff of an interest in a cottage along the lake shore at Lexington, Michigan, which plaintiff claims belonged to plaintiff and defendant. Inasmuch as on appeal plaintiff does not appear to claim any direct wrongdoing or conspiracy as to the Ten Mile road property, we need not discuss any facts in regard to it.

Shortly after their marriage, plaintiff and defendant purchased a home on Edgewood boulevard in Berkley, Michigan, and resided there until the summer of 1940. At that time they separated as a result of defendant's infatuation with another woman.

Defendant left for Chicago and was later joined by plaintiff after a reconciliation. Plaintiff had joined in mortgaging the Berkley home about 1937. In 1940, when they contemplated leaving Berkley, there was an outstanding sheriff's deed on foreclosure of the mortgage, as well as some $1,800 in bills unpaid by defendant. These obligations were taken care of by defendant's father who sold the property, sending to plaintiff in Chicago the balance of the purchase price that was left after payment of the mortgage and debts. Plaintiff and her husband signed a quitclaim deed to his father as a consideration for his assuming the obligations. Plaintiff contends that she received nothing personally from the transactions and that the money she received she used to pay her husband's debts. She admits, however, that part of it went to pay hospital bills incurred by her during the time the parties were separated. We find that no conspiracy of any kind was proven as to the Berkley property.

Upon the death of Monica Stephenson, the first wife of codefendant Burnette F. Stephenson, certain assets came into his hands as defendant's guardian. Defendant and his brother inherited a fine residence at 131 Longfellow avenue, Detroit, Michigan, from their mother Monica Stephenson. Defendant's father had lived there for the past 20 years and upwards and was living there in 1931 before plaintiff and defendant married and moved to their own home. According to the testimony of defendant's father, the Longfellow avenue house is a 3-story structure with 10 rooms, a kitchen and 3 baths. The property was originally encumbered with a $14,000 mortgage which the father paid over the years. In 1939, defendant and plaintiff signed a deed for defendant's one-half interest in the property for a consideration of $2,000. The deed was made to the brother instead of to the father because the latter was having trouble

in regard to his income tax and feared that a government lien would be placed against the property if title were taken by him. The brother subsequently deeded the property to defendant's father. There seems to be little question but that plaintiff and defendant were at least to a degree subject to the direction of the father, who was frequently putting up money, some for the support of defendant but principally to pay defendant's debts. Defendant's father at one time owned the Stephenson Land Company and still seems to be in full control of it. As a rule defendant's withdrawals came from the Stephenson Land Company but the father was the real party from whom eventually the moneys came. Plaintiff claims that defendant's father promised her, when she signed the deed for the Longfellow property, that he, defendant's father, would see to it that neither she nor his grandchildren by her would come to want. Defendant's father denies this. It would seem quite natural that he might have made some such statement and unquestionably large sums of money were paid to defendant and smaller amounts to plaintiff but this is far from proof of a conspiracy. The record would indicate that $2,000 was a very low price for defendant's interest in the equity in the Longfellow home; further, that defendant's father had been living in the house these many years, both before and after the deed, without paying any rent. Nevertheless, plaintiff and defendant signed the deed and proof of conspiracy is lacking.

In 1937 an interest in certain property at Woodward and Richton avenues in Highland Park, Michigan, was the only asset of value left in the guardianship estate. This property was heavily mortgaged and evidently did not bring in a sufficient return to take care of the carrying charges. It has frequently been brought to our attention that in the 1930's prop-

erty values were still depreciated and similar property was frequently referred to as distressed real estate. Although plaintiff with her limited experience may not have been familiar with estate affairs, she joined in the deed of conveyance of the Highland Park property at the request of her father-in-law and thereby alienated her interest. She now contends there was no necessity to sell the property and that the money received from the sale went to pay her husband's debts and she received none of it personally. This is far from proof of any conspiracy to deprive her of property rightfully hers.

Defendant, in addition to being an heir to one-half of the estate of Monica Stephenson, was also an heir to one-sixth of the estate of James W. Flynn. The latter's estate was a sizable one, a large part of it consisting of stocks, some of which became worthless. As guardian of defendant, the latter's father for years failed to file an annual account. When he finally did so it showed that defendant's interest in the estate had been entirely used up. The final account was approved by the probate court and defendant's father was discharged as guardian.

As we have noted, the real estate involved herein, with the exception of the Lexington and Berkley properties, was under the direct control of defendant's father as administrator of the estate of James W. Flynn, the estate of Monica Stephenson, and the guardianship estate of his 2 sons. Plaintiff's attorney sought to inquire into alleged irregularities in the handling of the funds of defendant in such estates by the father, also in the books and records of the Stephenson Land Company, from which defendant evidently was able to draw moneys but had no stock interest so far as the record shows. It is quite apparent that defendant's father controlled the Stephenson Land Company, of which he was the sole owner for a long period and subsequently held

a majority interest. The net worth of the Stephenson Land Company is not shown. It had 3,000 shares of stock.

We realize the difficulty that plaintiff's attorney had in his attempt to show fraud and conspiracy. Grave grounds of suspicion were shown with innuendo but no actual proof of a conspiracy. The charges are rather vague. Plaintiff claims that the conspiracy began as early as 1940. The property at Woodward and Richton avenues in Highland Park was transferred in 1937. As a matter of fact, however, plaintiff had full knowledge of the documents she was signing or opportunity to learn about them. At times she received checks payable to her and she used the proceeds to pay not only her husband's debts but for the family support. Defendant is not questioning any of the transactions. If any fraud was committed by the fiduciary it was against the defendant, and plaintiff's loss therefrom would at the most be too indirect to entitle her to recovery. Although it is charged that there was a conspiracy between father and son to put the son's property beyond the reach of plaintiff and thus prevent her from obtaining a property settlement as well as alimony, we find lack of sufficient proof to warrant a decree in this respect in plaintiff's favor. The trial judge held that there was not sufficient proof and we cannot disturb his judgment in that respect as no claimed error was shown.

We do find a distracted father trying to help his son who was constantly in trouble. The record does not, however, indicate that the father suffered any financial loss thereby. His occupation of the home on Longfellow avenue in Detroit without paying rent and then purchasing his son's equity therein for only $2,000, as well as the many other facts that were developed in the case, would indicate that the father was protecting himself financially and not plaintiff

or her 2 children to whom he stood in such a close relationship.

Plaintiff had an expert accountant make a limited examination of the account of defendant as reflected on the books of the Stephenson Land Company and the files of the probate court for Wayne county in the matter of the estate of Monica V. Stephenson and in the father's guardianship of defendant and his brother. The court refused to permit any testimony in regard to the guardianship matters as reflected by the files of the probate court.

It will serve no useful purpose to go into the many details of the guardianship account as the charges of fraud, which we do not believe were proven, are not being made by defendant. It is indicated that defendant's father charged large sums expended for the defendant to the guardianship account and thus exhausted its assets. There is no doubt that the entire account was handled carelessly but defendant himself makes no claim to that effect, nor does there appear sufficient proof of any conspiracy so as to warrant relief to plaintiff on that ground.

We believe the court was correct in its ruling as to the expert accountant's report inasmuch as no conspiracy to defraud was established and the final account in the probate court was allowed and the guardian discharged. We have examined the report of the expert accountant and we find that it discloses no fraud. It is true that the reports of defendant's father were very general in their terms but they disclose no fraud and the probate court saw fit to allow them. Without proof of conspiracy we do not believe that plaintiff is now entitled to attack them, and the trial court was correct in excluding the expert accountant's reports regarding the probate court files.

The trial judge held that defendant had no interest in the cottage or home at Lexington, Michigan,

formerly occupied by the parties. In the summer of 1944 defendant, after having had numerous jobs which he eventually lost, was again employed by the Stephenson Land Company and sent to Lexington, Michigan, to supervise a cherry orchard which it owned. He was soon joined there by plaintiff and their children who remained a large part of the summer. It was difficult to find a house to live in but an unfurnished cottage was found. An agreement was entered into with Fred Wood, the owner, now deceased, to waive a down payment for the purchase of the property if it were immediately improved. $100 was paid to Mr. Wood for a binder by the Stephenson Land Company, to whom a receipt was issued. According to defendant, he was to pay $325 on December 26, 1944, to obtain a land contract. He asserts that the property was to be bought in his name alone although he admits that at the outset of the dealings with Mr. Wood, plaintiff appears to have participated. Although defendant claims that there were no other written documents, there is a very strong indication to the contrary. It appears that Wood addressed both plaintiff and defendant when he wrote in reference to their contract. Plaintiff's sister testified that she was shown such a land contract in the summer of 1944. Improvements specified in the oral contract were made, the Stephenson Land Company advancing $1,058 for that purpose. Although defendant testified to the contrary, plaintiff and her sister both insisted that plaintiff performed manual labor while helping with the improvements on the inside of the house.

Plaintiff later returned to Chicago but defendant refused to follow her and remained in Lexington after the summer ended. Illinois divorce proceedings were begun by plaintiff but discontinued. In November of 1944 the Stephenson Land Company wrote to plaintiff asking her to execute a quitclaim deed and

also an assignment of the land contract for the Lexington property to the Stephenson Land Company in order to protect it for the $1,058 which it advanced for the improvement of the property. Plaintiff would not sign these documents despite the fact that defendant's father refused to send money for her support if she did not do so. Defendant claims that both he and plaintiff were later served with papers through the mail canceling their interest in the property, for the protection of the company, but plaintiff denies this.

Plaintiff returned to Michigan at the end of the year. While plaintiff was in Chicago, defendant met codefendant Shirley Miles and they planned to get married after plaintiff secured a divorce. Miss Miles was a waitress in the hotel at Lexington, Michigan, when defendant met her. She must have known that defendant was a married man when she became so intimately acquainted with him. She testified that when she learned that defendant would be unable to assume the land contract on the Lexington property she used funds of her own and obtained a contract for the property but did not produce it as she was unable to find it.

The original papers for the purchase of the property from Mr. Wood were not produced, the claim being that when Mr. Wood died these papers also were lost. Miss Miles testified that so far as she knew there had been no previous contract. She claims that she did not know of any interest that either plaintiff or defendant still had in the property when she made the alleged new contract with Wood. Plaintiff also was unable to produce the contract entered into by defendant, with or without her, while defendant claims there was none. If there were, it would probably have been in defendant's possession. The attorney who had acted for defendant's father and the Stephenson Land Company did draft

the aforementioned quitclaim deed and assignment of land contract for the Lexington property to be signed by plaintiff. When attorney for plaintiff undertook to cross-examine this attorney, an objection on the ground that there was a confidential client-attorney relationship was sustained by the trial judge. While plaintiff's attorney objected to the ruling, it becomes unimportant for there is a legitimate inference to be drawn from the facts which were disclosed, that plaintiff must have had an interest in the property as otherwise she would not have been asked to sign a quitclaim deed and an assignment of land contract.

Miss Miles testified that on February 28, 1945, she paid down $963.03, borrowing $650 from her brother to make the payments and assuming its obligations of $40 a month. The total purchase price of the property was $4,436.36, plus $800 borrowed from Mr. Wood for improvements. With the exception of such work as plaintiff did in improving the property in 1944, all of the other work in making substantial improvements was done by defendant who also paid for all work and material furnished by others. He also had made all the payments on the contract for the house for 1946 and thereafter. Miss Miles has not worked since 1945 with the exception of earning $75 for some typewriting work for the Stephenson Land Company.

There is no indication in the record as to the present value of the Lexington property. There appears to be a substantial equity in the property over and above the amount still due the title owners. If Miss Miles has ever put any money into this property she has received back an equivalent value in the years during which she has occupied the property rent free.

The costs in the case, with an increased attorney fee, will be very substantial. The printed record alone contains 589 pages. Inasmuch as defendant has

made it difficult at times to collect the $25 a week awarded for the support of the 2 minor children, it may also be correspondingly difficult to collect the costs, including an increased attorney fee. We, therefore, order that unless such costs and attorney fees are paid within 30 days after the date that the decree is entered in this Court and the court costs taxed, the case will be remanded to the trial court so as to ascertain the amount still due the vendors of the property and to perfect and enforce a lien against the equity in the Lexington property. The payment of such costs, including attorney fee and costs in the trial court, shall be paid in such instalments as the trial court shall determine. The final order of the trial court shall provide for the immediate foreclosure of the lien in case of the nonpayment of any instalment. The lien shall be in addition to any other legal method of enforcing the payment of the costs and attorney fee.

Defendant is gainfully employed by the Stephenson Land Company, the owner of the cherry orchard. At the time of the hearing his latest known annual earnings was $4,550 for 1948. We have frequently held that the remarriage and additional expense thus incurred by a divorced husband in no way excuses him from paying alimony. Obviously this is true when a married man lives with another woman and their son. The court allowed only $25 a week for the support of the 2 minor children. The sum seems wholly inadequate but in view of the fact that one of the children is married and will be 21 years of age shortly, we are not increasing the amount but order that the payment of the entire $25 a week shall be continued for the support of the other child during his minority.

The record shows that plaintiff has worked hard to support herself and the 2 minor children but that her earnings have been inadequate and she has been

dependent upon help from her family and the charity of others. There has not been a breath of suspicion cast upon her conduct during her married life.

We hold that she shall be entitled to $50 a month alimony during such time as she remains unmarried, such amount being subject to modification by being either increased or decreased, as circumstances may develop. Plaintiff shall be entitled to costs of both courts and attorney fees of $750 to be paid by defendant. No costs are awarded against or in favor of either codefendant. The decree as modified in accordance with this opinion will be entered.

DETHMERS, CARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.

The late Chief Justice NORTH did not sit.